# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RONALD L. O'BERT,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:08-cv-660
Beckwith, J.
Hogan, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff brings this action pro se pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for Disability Insurance Benefits (DIB). This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's memorandum in opposition (Doc. 14), and plaintiff's reply memorandum. (Doc. 15). For the reasons that follow, the Court recommends that the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff was born in 1944. He has a high school education, a two-year nursing diploma degree, and specialized training in anesthesia nursing. His past work experience was as a nurse anesthetist. Plaintiff filed an application for DIB in February 2004 alleging on onset of disability of October 28, 2002. Plaintiff's insured status for DIB purposes expired on December 31, 2002. Plaintiff's application was denied initially and upon reconsideration.

Plaintiff requested and was granted a de novo hearing before an ALJ. In March 2006, plaintiff, who was represented by counsel, appeared and testified at an ALJ hearing.

On September 8, 2006, the ALJ issued a decision denying plaintiff's application for DIB.

The ALJ determined that plaintiff had the following medically determinable impairments: status post coronary bypass, lumbar back pain, diabetes, and obesity. (Tr. 18). The ALJ determined that none of these impairments, either alone or in combination, constituted a severe impairment or severe combination of impairments prior to December 31, 2002, the date last insured. (Tr. 18). Accordingly, the ALJ concluded that plaintiff is not disabled under the Act, and therefore not entitled to DIB. Plaintiff's appeal to the Appeals Council was denied, making the ALJ's decision the final decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected

2

to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v.*

3

*Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94; *Roush v. Barnhart*, 326 F. Supp.2d 858, 866 (S.D. Ohio

4

2004). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

In April 1999, plaintiff underwent a colonoscopy which revealed benign colon mucosa with significant diagnostic abnormality and moderate chronic inflammation at the gastroesophageal junction. (Tr. 142-45). His diagnosis was diarrhea and possible Barrett's esophagus. (Tr. 142). The examining physician suspected irritable bowel syndrome. (Tr. 143).

In May 1999, plaintiff underwent a coronary artery bypass graft. (Tr. 177). He was hospitalized for six days and discharged home in good condition. (Tr. 178). Thereafter, he participated in cardiac rehabilitation and was assessed as doing relatively well two months after

his surgery. (Tr. 152-56).

A November 1999 of the lumbar spine showed moderate spinal stenosis at L4-5 and a mild central disc bulge at L4-5. (Tr. 244).

In a letter dated February 3, 2000, Dr. Paul Chandler, a board certified internist and endocrinologist and plaintiff's treating physician, reported that plaintiff has severe spinal stenosis for which he takes medication on a daily basis including Celebrex and Parafon Forte. (Tr. 405). He reported that the MRI scan of November 1999, which confirmed significant spinal stenosis, also showed degenerative disc disease and a synovial cyst. *Id.* Dr. Chandler reported that plaintiff was "quite symptomatic" and taking medicine continuously for his impairments. *Id.*

On May 5, 2000, plaintiff was seen in the emergency room for a headache that started four days ago. (Tr. 249). The headache was assessed to be most likely viral in origin and plaintiff was prescribed medication and discharged in stable condition with symptoms much improved. (Tr. 250). A May 12, 2000 MRI of the head was normal. (Tr. 255).

Plaintiff was seen by Riverhills Healthcare on May 17, 2000 for headaches. (Tr. 260). Plaintiff complained of daily headaches, worse over the last 12 days. His neurological exam was normal and he was considered for a migraine preventive medicine. (Tr. 261). On May 24, 2000, plaintiff was clearly improved on Neurontin, but having increased blood pressure problems. (Tr. 264). The Neurontin was stopped and he was started on Depakote. (Tr. 264). Office notes from plaintiff's May 25, 2000 visit to his cardiologist noted that plaintiff recently developed headaches and an increase in his blood pressure. (Tr. 157). He was assessed with a recent development of hypertension. *Id.* When plaintiff failed to show significant improvement by May 26, 2000, he was prescribed alternative medication and a carotid ultrasound study was ordered.

6

(Tr. 266). The carotid artery bifurcation study was normal. (Tr. 269). Plaintiff showed no improvement at his exam on June 2, 2000 and was started on a new medication. (Tr. 270). A note from his doctor dated June 2, 2000 stated that plaintiff continued to experience severe apparent migraines and would be unable to work until June 7, 2000. (Tr. 275). On June 7, 2000, plaintiff reported significant improvement on Indocin. (Tr. 272).

A June 2000 myocardial perfusion scan and myocardial gated wall motion study were normal. (Tr. 168).

On March 5, 2001, plaintiff's employer, Physicians Anesthesia Service, notified plaintiff that the executive committee decided to lower his work days from 5 days per week to 2 days a week beginning May 1, 2001, for a period of not less than 6 months. (Tr. 276). At the end of the six month period, and depending on coverage needs, the possibility of increasing the number of hours would be discussed. (Tr. 276). Plaintiff's request for a leave of absence for April 2001 was approved. (Tr. 276). Plaintiff's employer noted plaintiff's difficulty working regularly and consistently. (Tr. 276).

In April 2001, Dr. Wayne, plaintiff's treating cardiologist, noted that plaintiff was doing well without complaints of chest pain, pressure or shortness of breath. (Tr. 158). Dr. Wayne noted that plaintiff complained of vague dysautonomic[1] feelings at times, but in general was "getting along okay" and "appears stable." *Id.*

Plaintiff's May 2002 myocardial stress test showed no evidence of stress induced reversible myocardial ischemia. (Tr. 169).

---

[1]Dysautonomia is an abnormal functioning of the autonomic nervous system. (http://dictionary.reference. com/browse/dysautonomia)

7

CT scans of the sinuses and temporal bones/internal auditory canals on November 7, 2002 were normal. (Tr. 257-58).

On November 14, 2002, plaintiff was examined by Dr. Lisa Mannix, a headache specialist and board certified neurologist. Plaintiff described three different types of headaches that he experienced. (Tr. 278). He also reported a headache that he thought was associated with longstanding depression. (Tr. 278). Plaintiff also complained of anxiety, phobias, panic attacks, mild sleep apnea, dizziness, vertigo, irritable bowel symptoms, and hearing loss. (Tr. 279). Plaintiff worked 2 to 4 days a week in the operating room, but he recently lost that job due to absenteeism. *Id.* He had requested a leave of absence as he had in the past but was denied. *Id.* On physical examination, plaintiff appeared depressed and his affect was flat. *Id.* Plaintiff was oriented, his memory was intact, and his attention span, language, and fund of knowledge were normal. (Tr. 280). Dr. Mannix diagnosed chronic daily headaches, longstanding in nature and related to underlying migraine without aura. (Tr. 281). Dr. Mannix also diagnosed analgesic overuse with Tylenol, decongestants, and possibly other pain medications, and sexual headaches, likely of dull, not explosive or postural type. *Id.* Dr. Mannix noted that factors affecting his management include depression, anxiety, diabetes, coronary artery disease, sleep apnea, obesity and hypertension. *Id.* Dr. Mannix recommended an MRI of the brain and counseled plaintiff regarding headache mechanisms and triggers. *Id.* She also recommended plaintiff stop taking Tylenol and be started on alternate medications. *Id.*

At plaintiff's November 26, 2002 office visit, Dr. Wayne noted that plaintiff recently experienced more shortness of breath and problems with his hearing. (Tr. 159). Dr. Wayne ordered an echocardiogram and stress test. *Id.* Plaintiff's December 2002 stress test showed no

additional ECG changes with exercise. (Tr. 160). His echocardiogram revealed normal left ventricular function. (Tr. 161).

A November 27, 2002 MRI of the brain showed mild diffuse volume loss and minimal abnormal signal within the pons suggesting small vessel ischemic change. There was no additional focal parenchymal abnormality. (Tr. 248).

At a follow up examination on December 16, 2002, Dr. Mannix noted plaintiff was still experiencing three days of headaches following intercourse and experienced one headache triggered by stress. (Tr. 282). His medications included Celebrex, Indocin, Darvocet, and Fioricet. *Id.*

Dr. J. Thorpe, a pulmonary consultant, examined plaintiff on December 18, 2002. (Tr. 306). Plaintiff complained of migraine headaches that increased after sexual activity, and he denied anxiety. (Tr. 307). Dr. Thorpe reported that all gastrointestinal and psychiatric elements were normal. (Tr. 308). A subsequent sleep study revealed obstructive sleep apnea. (Tr. 313).

Dr. Mannix's notes from January 23, 2003 revealed "depression" daily headaches. (Tr. 284). Plaintiff reported no headache free days. *Id.* His medications included Indocin, Fioricet with codeine, Darvocet, Diamox, and Amantadine. *Id.*

A state agency psychologist reviewed plaintiff's medical record, and on April 16, 2004, she assessed plaintiff's mental impairment as of December 31, 2002, his date last insured. (Tr. 353-65). The psychologist found plaintiff had no medically determinable mental impairment before his date last insured. (Tr. 353, 365).

Two state agency physicians reviewed plaintiff's medical record and based on plaintiff's exertional limitations, opined that plaintiff had the residual functional capacity to lift 20 pounds

9

occasionally, but only 10 pounds frequently, stand and sit about six hours in an eight-hour workday, and could occasionally climb ladders, ropes, or scaffolds. (Tr. 365-66). The state agency physicians also opined that the symptoms alleged by plaintiff were attributable to a medically determinable impairment and that the severity or duration of the symptoms were not disproportionate to the expected severity or duration on the basis of plaintiff's medically determinable impairments. (Tr. 370).

On March 27, 2006, Dr. Chandler reported that he had been plaintiff's primary care physician since August 1999. (Tr. 509). Dr. Chandler opined that plaintiff became disabled on October 28, 2002, because of "many separate disease states" including coronary heart disease, bypass grafting, hypertension, diabetes, dysthymia, gastroesophageal reflex disease, and disabling headaches. (Tr. 509). He reported that plaintiff is doing "ok" with diabetes, but his other diseases have progressed over time. (Tr. 509). Dr. Chandler opined that plaintiff was disabled at that date and was "more disabled now," and he "certainly" should "receive an approval for disability." (Tr. 509). Dr. Chandler also reported that plaintiff had recent problems with hemoragic ischemic bowel disease and dysautonomia of a very unusual debilitating type. (Tr. 509).[2]

Plaintiff submitted evidence to the Appeals Council after the ALJ's decision. That evidence includes an October 8, 2002 note that plaintiff's depression had increased some since August and September. (Tr. 522). A November 5, 2002 note indicates plaintiff had migraines and called in sick on November 4, 2002, and the week before. (Tr. 522).

---

[2]The record contains additional evidence post-dating plaintiff's date last insured. Where pertinent, the Court has cited and discussed such evidence in the body of this Opinion.

10

Plaintiff's employer completed a Mutual of Omaha insurance form for disability benefits for plaintiff. (Tr. 524). Plaintiff last worked on October 28, 2002, and his employer stated he could not attest to plaintiff being totally disabled. (Tr. 524). An October 30, 2002 office note from Group Health Associates indicates plaintiff complained of ear and headache pain. (Tr. 526). He was also assessed as positive for "fluctuant hearing." (Tr. 526).

Plaintiff has also presented evidence to this Court. That evidence consists of a February 29, 2009 memo from plaintiff's son who is a physician. Plaintiff's son stated that he lived with plaintiff from June 2000 through June 2004, and that he witnessed his father's clinical depression, anxiety, occasional delusions, frequent migraine headaches, chronic low back pain, and a "host of other medical problems" including coronary artery disease, dyslipidemia, and diabetes mellitus. Plaintiff's son concluded that in his observation as a member of the household and with his "knowledge as a physician," he felt that plaintiff "was and is disabled from his medical conditions." (Doc. 10, attachment). Plaintiff also submitted certificates from Dr. Chandler indicating Plaintiff could return to work on May 22, 2000, for three times a week for the first week and then routinely thereafter. Plaintiff could also return to work on May 28, 2001. *Id.* Plaintiff also submitted a January 2003 note from Dr. Miller, his treating psychiatrist, that plaintiff's "wife (& I) wonder if too ill to work." *Id.*

## OPINION

In his pro se statement of errors, plaintiff states his attorney at the administrative hearing failed to obtain records from his treating psychiatrist, Dr. Michael Miller, who has treated him for several years for major depression. Plaintiff states that some of these records were submitted to the Appeals Council, but the Appeals Council declined review and failed to consider the

11

records. Plaintiff also argues the onset date of disability should be amended to May 1, 2000, when his irritable bowel syndrome, depression, and headaches became much worse and affected his ability to work on a full time basis. Plaintiff also contends the ALJ erred when he found no evidence of irritable bowel or headaches for the pertinent time period, and failed to consider evidence of plaintiff's depression. Plaintiff also points to evidence which he believes supports his claim for disability benefits.

Because plaintiff is proceeding pro se, the Court has carefully reviewed the ALJ's decision to determine whether the ALJ's critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports those findings. After a careful review of the record, the Court determines that the decision of the ALJ is not supported by substantial evidence and should be reversed and remanded for further proceedings.

As an initial matter, the Court must address the issue concerning the additional evidence submitted by plaintiff to the Appeals Council and to this Court. When the Appeals Council declines review, as in this case, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). The Court may not consider the new evidence presented to the Appeals Council in deciding whether to uphold, modify, or reverse the ALJ's decision. *Id.* at 696. *See also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). "The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline*, 96 F.3d at 148. Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v.*

12

*Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Evidence is considered "material" if "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (citations and internal quotation marks omitted). To show good cause, the moving party must present a valid justification for the failure to have acquired and presented the evidence in the prior administrative proceeding. *Id. See also Oliver v. Secretary of H.H.S.*, 804 F.2d 964, 966 (6th Cir. 1986); *Willis*, 727 F.2d at 554.

The evidence from Dr. Miller is not new since it was in existence at the time of the ALJ hearing. *Foster*, 279 F.3d at 357. Nor has plaintiff established good cause in this case. Plaintiff has presented no valid justification for failing to present this evidence to the ALJ. An allegation of attorney error has not been found to constitute good cause for purposes of a Sentence Six remand. *See Taylor v. Commissioner*, 43 Fed. Appx. 941, 943 (6th Cir. 2002). Therefore, the additional evidence presented to the Appeals Council cannot be considered by the Court in this appeal, and the Court will not recommend a Sentence Six remand of this matter on the basis of this evidence.

To establish his claim for disability benefits, plaintiff must establish he was disabled on or before December 31, 2002, the date his insured status expired. *See Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984). Plaintiff "need not prove that he was disabled for a full twelve months prior to the expiration of his insured status" on December 31, 2002. *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984). Rather, he must only show "the onset of disability prior to the expiration of his insured status," *Gibson v. Secretary*, 678 F.2d 653, 654 (6th Cir. 1982), and that such disability has lasted or is expected to last for a continuous period of twelve months. 42

13

U.S.C. § 423(d)(1)(A).[3]

The ALJ determined that plaintiff did not suffer from a severe impairment or combination of impairments for 12 consecutive months. (Tr. 18). The ALJ stated, "There is no evidence in the record that shows any work related limitations during the period from October 28, 2002 through December 31, 2002, a period of just over two months." (Tr. 20). Because the ALJ determined that plaintiff did not suffer from a severe impairment, he stopped at step two of the sequential evaluation process. Therefore, the question for the Court is not whether plaintiff was in fact disabled for purposes of DIB prior to December 31, 2002, but whether the ALJ's severity finding is supported by substantial evidence. Based on the current record, the Court determines that the ALJ's non-severity finding is without substantial support in the record.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d

---

[3]The Social Security Act defines disability as the inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted *or which can be expected* to last for a continuous period of not less than twelve months.

42 U.S.C. § 423(d)(1)(A) (emphasis added).

14

352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

In determining plaintiff did not have a severe impairment, the ALJ gave "substantial" weight to the opinions of the state agency doctors who allegedly "found no evidence of severe impairment between the alleged onset date and the date last insured." (Tr. 20). Contrary to the ALJ's decision, the reports of the state agency physicians actually support a finding of severity in this case. In addition, the ALJ erroneously limited himself to an examination of the November and December 2002 evidence to the exclusion of other evidence which was relevant to whether plaintiff suffered from a severe impairment prior to his date last insured.

The state agency physicians, Drs. Cho and McCloud, completed physical residual functional capacity assessments in April and July 2004 in connection with plaintiff's initial application for benefits and his request for reconsideration of the denial of those benefits. (Tr. 366-371). The RFC report specifically states that the RFC assessment is for plaintiff's date last insured of December 31, 2002, and not a "current evaluation." (Tr. 366). In addition, while the form gives an option for designating "no" exertional impairments, the doctors did not check this box. (Tr. 367). Instead, they checked the boxes showing plaintiff had specific limitations in lifting, standing, walking and sitting based on his exertional impairments. (Tr. 367-368).

The fact that Drs. Cho and McCloud completed a residual functional capacity form

**15**

implies they found plaintiff's impairments were "severe" for purposes of plaintiff's Social Security claim. Section 404.1520(a) of the Social Security regulations describes the process that the Social Security Administration follows in evaluating a disability claim:

> The five-step sequential evaluation process. The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and *we do not go on to the next step*.

20 C.F.R. § 404.1520(a)(4). As explained above, *supra* at p. 3, the "severity" assessment is made at the second step of the sequential evaluation process. If an individual does not have a severe impairment or combination of impairments, the process stops at step 2. On the other hand, if an individual has a severe impairment, but does not meet or equal a listed impairment at step 3 of the process, then the next step of the process requires an assessment of residual functional capacity. *See* 20 C.F.R. § 404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). It is only at step 4 of the process that the residual functional capacity is assessed:

> If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.

*Preslar v. Sec. of Health and Human Services*, 14 F.3d 1107, 1110 (6th Cir. 1994). *See also*

Social Security Ruling 96-8p.[4] Moreover, in describing the sequential evaluation process, Social

Security Ruling 86-8 clarifies that RFC is not assessed until step 4 of the process:

> Since the severity of the impairment must be the primary basis for a finding of disability, this step of the evaluation process [step 4] *begins* with an assessment of the claimant's functional limitations and capacities. Then a determination or decision must be made as to whether the individual retains capacity to perform past relevant work.

SSR 86-8 (emphasis added). *See also Bowen v. City of New York*, 476 U.S. 467, 471 (1986) ("If

the claimant's impairments are not listed, the process moves to the fourth step, which assesses

the individual's 'residual functional capacity' (RFC)"). The state agency doctors are responsible

for assessing RFC at step 4 at the initial and reconsideration stages of the disability determination

process. 20 C.F.R. § 404.1546 (a). Thus, implicit in Drs. Cho and McCloud's step 4 RFC

assessment is a finding that plaintiff necessarily satisfied step 2 of the sequential evaluation

process and suffered from a severe impairment or severe combination of impairments. The

ALJ's finding to the contrary is without substantial support in the record.

The ALJ also erred by stating there was no evidence of headaches during the time period

---

[4]That ruling states, in relevant part:

When an individual is not engaging in substantial gainful activity and a determination or decision cannot be made on the basis of medical factors alone (i.e., when the impairment is severe because it has more than a minimal effect on the ability to do basic work activities yet does not meet or equal in severity the requirements of any impairment in the Listing of Impairments), the sequential evaluation process generally must continue with an identification of the individual's functional limitations and restrictions and an assessment of his or her remaining capacities for work-related activities. This assessment of RFC is used at step 4 of the sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering his or her age, education, and work experience.

Social Security Ruling 96-8p.

in question. (Tr. 19).[5] Plaintiff has a long history of treatment for headaches, dating back to May 2000. (Tr. 249, 260-264, 157, 266, 270-275). Plaintiff was evaluated by Dr. Mannix, a specialist, on November 14, 2002, prior to his date last insured. Dr. Mannix diagnosed chronic daily headaches, longstanding in nature and related to underlying migraine without aura. (Tr. 281). Dr. Mannix also diagnosed sexual headaches, likely of dull, not explosive or postural type. *Id.* Dr. Mannix noted several factors that affected the management of plaintiff's headaches, including depression, anxiety, diabetes, coronary artery disease, sleep apnea, obesity and hypertension. *Id.* Dr. Mannix recommended an MRI of the brain and counseled plaintiff regarding headache mechanisms and triggers. *Id.* Dr. Mannix also recommended plaintiff stop taking Tylenol and be started on alternate medications. *Id.*

Dr. Mannix's subsequent office notes confirm that his condition remained the same or got worse over the next half year and that several trials of medication were attempted with little success. (Tr. 282-293). In July 2003, Dr. Mannix reported to Dr. Chandler, plaintiff's treating internist, that after her initial consultation in November 2002, plaintiff was tried on a variety of medications without much success. (Tr. 499). He was also using a CPAP machine for a sleep disorder but it did not significantly improve his headaches. *Id.* She performed bilateral occipital nerve blocks in April 2003, and after a trial of Topamax in May 2003 he became increasingly depressed. Plaintiff was not working, which was "a significant psychological stressor to him." *Id.* Dr. Mannix stated that in addition to his headaches, plaintiff's depression was a major factor

---

[5]The Commissioner argues that "the ALJ reasonably found no objective evidence of headaches during the critical period of time at issue in this case" in spite of Dr. Mannix's diagnosis of headaches. (Doc. 14 at 10). Contrary to the Commissioner's argument, the ALJ did not reject a finding of headaches based on a lack of "objective" evidence. The ALJ failed to even recognize plaintiff had been diagnosed with headaches or received any treatment for this condition. (Tr. 19).

18

in his inability to work and that he was often tearful and flat when in her office. *Id.* Dr. Mannix

noted that plaintiff was "out of work on short-term disability" and advised plaintiff to consider

"permanent" disability. *Id.*

The ALJ's failure to consider any of this post-insured status evidence was in error. *See*

*Higgs v. Bowen,* 888 F.2d 860, 863 (6th Cir. 1988) (stating parenthetically, "evidence of medical

condition after insurance cutoff must be considered to the extent it illuminates claimant's health

before that date"); *Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976) (medical evidence of

impairment after insured period may establish existence of same impairment during earlier

insured period if temporal relation is reasonably proximate and supported by corroborative

evidence arising during insured period). "Medical evidence that postdates the insured status date

may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the

expiration of insured status." *Anderson v. Commissioner of Soc. Sec.,* 440 F. Supp.2d 696, 699-

700 (E.D. Mich. 2006). The ALJ did not consider the medical evidence of plaintiff's headaches

subsequent to the date last insured, which had a direct bearing on the existence and severity of

his condition prior to his date last insured. Dr. Mannix's post-insured status notes confirm

plaintiff's headaches were more than "a slight abnormality" which had such a minimal effect on

plaintiff that they would not be expected to interfere with his ability to work. *Farris*, 773 F.2d at

90. In addition, the existence of plaintiff's headaches are further supported by the December

2002 report of Dr. Thorpe (Tr. 307), as well as Dr. Chandler's March 2006 report. (Tr. 509). By

ignoring the post-date last insured evidence from Dr. Mannix which supports the conclusion that

plaintiff's headaches constituted a severe impairment, the ALJ erred at step two of the sequential

evaluation process. Therefore, the ALJ's severity finding is not supported by substantial

evidence and should be reversed.

This matter should be remanded for further proceedings because all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *Faucher,* 17 F.3d at 176. The ALJ stopped at step two of the sequential evaluation process and did not determine plaintiff's RFC or its impact on his ability to perform his past work or other work in local or national economy. All of these are factual issues the Court may not determine de novo on judicial review. Thus, this matter should be remanded for further proceedings, including a continuation of the sequential evaluation process. The ALJ should address the issues of onset and duration on remand as well.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/24/09_

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RONALD L. O'BERT,
    Plaintiff

Case No. 1:08-cv-660
Beckwith, J.
Hogan, M.J.

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within FIFTEEN (15) DAYS after being served with this Report and Recommendation ("R&R"). Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this R&R is being served by mail. That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within TEN DAYS after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☑ Agent
☐ Addressee

B. Received by ( *Printed Name* ) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Ronald L. O'Bert
9515 Country Trail
Loveland, OH 45140

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)*

7002 3150 0000 8388 4131

PS Form 3811, August 2001     Domestic Return Receipt     102595-02-M-1540

1:08cv660 (Doc. 16)